# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| PARIS CHURCH, | : | CRIMINAL ACTION |
|     a/k/a "Pay May," | : | No. 14-323 |
|     a/k/a "Pay," | : | |
| RONELL WHITEHEAD, | : | |
|     a/k/a "R," and | : | |
| SPENCER PAYNE, | : | |
|     a/k/a "Boodine," | : | |
|     a/k/a "Nur." | : | |

**MCHUGH, J.**                                                                                                                           **APRIL 25, 2017**

## MEMORANDUM

Defendants Ronell Whitehead, Spencer Payne, and Paris Church have filed supplemental motions to set aside their convictions pursuant to Federal Rules of Criminal Procedure 29 and 33. Because I find that the government presented sufficient evidence to support the guilty verdicts rendered against all three men, Defendants' motions will be denied.

## I.     UNDERLYING FACTS

In September 2014, the government charged 22 individuals, including Whitehead, Payne, and Church, with participating in a drug-trafficking ring in Chester, Pennsylvania. Because the alleged criminal enterprise was centered in the vicinity of Rose and Upland Streets, the government dubbed it the Rose and Upland Drug Trafficking Group (Rose Upland Group). The government's case against the Rose Upland Group grew out of a two-year investigation by federal, state, and local law enforcement, which featured over 60 controlled buys, thousands of hours of video and visual surveillance, extensive use of pen registers, and numerous wire-taps.

1

On March 8, 2016, after a nearly month-long trial, a jury found Payne, Whitehead, and Church guilty of conspiracy to distribute narcotics. The jury also convicted Payne and Church of various distribution charges, while Whitehead pleaded guilty to distributing narcotics.[1] All three defendants now challenge their convictions. Payne broadly claims that there was insufficient evidence as to all counts against him. Church claims that the evidence at trial did not prove beyond a reasonable doubt (1) that he conspired to distribute narcotics, (2) that he sold drugs on the dates alleged, or (3) that he sold drugs within 1,000 feet of a protected location (in this case, Widener University). Whitehead's claims relate only to his conspiracy conviction. He argues both that the government failed to establish the required elements of conspiracy and that there was insufficient evidence for the jury to conclude that 280 grams of cocaine base (crack) and 500 grams of cocaine were involved in the conspiracy and were known or attributable to him.

II.     **STANDARD OF REVIEW**

Church and Whitehead bring their post-verdict challenge on Rule 29 motions for judgement of acquittal. Payne seeks a new trial pursuant to Rule 33. Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the

---

[1] Specifically, the jury found all three Defendants guilty on Count One of the Second Superseding Indictment: conspiracy to distribute 280 grams or more of crack, 500 grams or more of cocaine, and 100 grams or more of heroin, in violation of 21 U.S.C. § 846. The jury answered interrogatories in which it found that 280 grams or more of crack, 500 grams or more of cocaine, and 100 grams or more of heroin were attributable or reasonably foreseeable to Church, 280 grams or more of crack and 500 grams or more of cocaine were attributable or reasonably foreseeable to Whitehead, and 280 grams or more of crack were attributable or reasonably foreseeable to Payne. Prior to trial, Whitehead pleaded guilty to Counts 50, 62, and 90: distribution and aiding and abetting the distribution of crack, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); and Counts 51, 63, and 91: distribution and aiding the distribution of crack within 1,000 feet of a protected location, in violation of 21 U.S.C. § 860(a). The jury found Payne guilty on Counts 52, 62, and 70: distribution of crack; Counts 53, 63, 71, and 73: distribution of narcotics within 1,000 feet of a protected location; Counts 72, 130, and 153: distribution and aiding and abetting the distribution of crack; Count 183: possession of cocaine with the intent to distribute; and Counts 125, 141, 184, 185, and 188: unlawful use of a communications facility to facilitate a drug trafficking crime, in violation of 21 U.S.C. § 843(b). The jury also convicted Church on Counts 128, 142, 155, and 164: distribution of cocaine; Counts 129, 143, and 165: conducting three of those cocaine distributions within 1,000 feet of a protected location; Count 190: distribution of heroin; and Count 202: distribution and aiding and abetting the distribution of cocaine.

evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. Because "we trust jurors to judge the evidence," courts review sufficiency of evidence under a "highly deferential" standard and "will overturn a verdict only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430–31 (3d Cir. 2013). Under this standard, "[w]hile evidence proffered at trial may be consistent with multiple possibilities," the role of a reviewing court "is to uphold the jury verdict—and not to usurp the role of the jury—as long as it passes the 'bare rationality' test." *Id.* at 432.

Rule 33 empowers district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014). "[M]otions for a new trial based on the weight of the evidence are not favored [and] . . . are to be granted sparingly and only in exceptional cases." *Id.*

### III. DISCUSSION

All three Defendants fail to carry their burdens under the relevant legal standards. Without restating the government's entire case, the essential evidence against Defendants is as follows.

**A. The Government's Evidence Against Payne and Whitehead**

At trial the government produced evidence that Payne and Whitehead, acting with their fellow members of the Rose Upland Group, jointly purchased drugs, pooled their inventory, split sale proceeds when necessary to meet customer demand, made use of shared stash houses and

3

alleyways to store drugs, and helped one another avoid police detection during sales. Taken together, this record provides compelling evidence that Payne and Whitehead were part of a coordinated effort to traffic in narcotics.[2]

In building its case, the government relied in part on testimony by cooperating defendant William Dorsey. Dorsey testified that he would purchase 125-gram quantities of cocaine (known as "points") on behalf of Whitehead and co-defendants Braheem Edwards and Michael Lewis. Tr. 2/25 at 217–18. Dorsey claimed that on "between five and eight" separate occasions spanning a period of several months, *id.* at 227, he bought eight to sixteen points (1,000 – 2,000 grams) and that Whitehead, Edwards, and Lewis would "break[] them down, selling them in ounces and stuff like that," *id.* at 219–20. Dorsey further testified that he knew Payne to sell powder and crack cocaine, *id.* at 238, that he would refer customers to Payne when he ran out of product to sell, that he would split sales with Payne, Tr. 2/29 at 5–6, and that he would occasionally "front" drugs to Payne—meaning that he would supply product upfront with the expectation of later payment, Tr. 2/26 at 129–30. Similarly, Dorsey stated that Whitehead once fronted him 28 grams of power cocaine, Tr. 2/29 at 13, and that Whitehead would sometimes split sales with him, Tr. 2/26 at 47. He also maintained that he, Whitehead, Payne, and their fellow members of the Rose Upland Group acted as lookouts for police while others were making sales. Tr. 2/26 at 46–47.

Two other cooperating defendants, Naim Butler and Javaughn Anderson, corroborated Dorsey's account of a coordinated drug trafficking operation around the intersection of Rose and Upland Streets. Bulter testified that he sold 3.5 grams of crack cocaine to Payne for resale in $5 increments, Tr. 3/2 at 271–72, that he had seen Whitehead selling bags of crack approximately

---

[2] *See United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008) ("The essential elements of a drug distribution conspiracy under 21 U.S.C. § 846 are: (1) a shared unity of purpose, (2) an intent to achieve a common goal, and (3) an agreement to work together toward the goal.").

100 times during the summer of 2012, *id.* at 274–75, and that he acted as a lookout for Payne and Whitehead and expected them to do the same for him, *id.* at 274–76, 280–81. Anderson testified that, on four or five occasions, Whitehead supplied co-defendant Breon Burton with 28 grams of cocaine for resale. Tr. 3/7 at 50–51. Anderson also described drug dealers on Rose Street as "together and organized . . . as far as like making money, as far as looking out for each other, when the cops -- giving each other eyes during the transactions. And splitting the sales, just basically make sure everybody make money." Tr. 3/7 at 93–94.

The testimony of cooperating defendants was consistent with evidence obtained by means of controlled buys, video surveillance, and pen registers. For example, on May 21, 2013, a confidential source attempted to buy 3.5 ounces of crack cocaine from Whitehead. Tr. 2/24 at 105–08. When Whitehead informed the source that he did not have sufficient product to execute the sale, the source called Naim Butler. *Id.* at 108–10. With Butler on the line, the source handed the phone to Whitehead. *Id.* at 110. After a conversation with Butler, Whitehead went into a nearby stash house and emerged with approximately two grams of crack, which he sold to the source. *Id.* at 112–15. During another controlled buy on June 12, a source purchased 10 baggies of crack cocaine, with Payne and Whitehead each contributing five baggies to the sale after retrieving the product from the same alleyway. *Id.* at 118–23. And on July 24, during another sale to a confidential source, Whitehead told Dorsey to be on the lookout for police during the transaction. *Id.* at 155–57. These controlled buys were captured by video surveillance cameras trained on various parts of the 300 block of Rosehill Street and by audio recorders worn by the confidential sources. Audio and video footage of controlled buys was played for the jury and interpreted by DEA Special Agent Randy Updegraff, who explained the meaning of various actions and phrases. Finally, FBI Special Agent Robert Lockhart presented

evidence showing that, in keeping with the government's theory of conspiracy, Payne and Whitehead had extensive phone contacts with Dorsey over a 16-month period in 2013 and 2014. Tr. 3/10 at 238–39.

Against this considerable body of evidence, Payne offers no argument in support his motion for a new trial, which merely restates the elements of Rule 33. Whitehead's Rule 29 motion, by contrast, is more developed. Its thrust is that no reasonable juror could have convicted him of conspiracy to sell narcotics in the quantities—280 grams of crack and 500 grams of cocaine—that were ultimately attributed to him. Whitehead's primary argument concerns Dorsey's purchases of between eight and sixteen "points" for Whitehead, Edwards, and Lewis. Whitehead does not dispute that these purchases took place, but he claims that Dorsey's testimony clearly established that they happened before August 2012, the start of the indictment period.

During trial, Whitehead's counsel, Mr. Pinto, raised an identical argument on an objection to the government's claim during closing argument that Dorsey made bulk purchases on behalf of Whitehead, Edwards, and Lewis in the fall of 2012. In considering Pinto's objection, I noted that Dorsey had offered seemingly conflicting testimony as to the timing of those purchases. On direct examination, the government had asked whether Dorsey began supplying "points" to Whitehead and others "around the fall of 2012" and Dorsey agreed that he had. Tr. 2/25 at 217. On re-cross, however, Pinto, had elicited from Dorsey the following testimony:

> Pinto: Regarding the cocaine that you said was -- there was a pooling of money to buy. You said that it happened a month or a month-and-a-half into your stay at Minsec [(a halfway house where Dorsey was serving out a sentence on a previous conviction)], is that correct? That would be in the beginning of 2012, correct?

6

| | | |
|---|---|---|
| Dorsey: | Correct. | |
| Pinto: | And then you said it happened again. This time it was the first few months of 2012, correct? | |
| Dorsey: | Correct. | |
| Pinto: | And then you said in April of 2012, it happened once again . . . was that right? | |
| Dorsey: | I don't know. You are reading it. | |
| Pinto: | I'm reading from the notes that were taken [during Dorsey's proffer session] | |
| Dorsey: | If that's what the notes say then yes. | |

Tr. 3/1 at 297–98.

As I said from the bench, Mr. Pinto deserves credit for effective cross-examination raising doubts about the timing of Dorsey's purchases on behalf of Whitehead, Edwards, and Lewis. Whitehead has not, however, demonstrated grounds for an acquittal. Dorsey's testimony on re-cross demonstrated that he had trouble remembering the precise dates on which he purchased cocaine for Whitehead, Edwards, and Lewis. It also showed that three of those purchases took place before May 2012.[3] On direct examination, however, Dorsey testified that he bought "points" for Whitehead, Edwards, and Lewis on "between five and eight" separate occasions, and that "several months" might elapse between purchases; he also linked at least some of the purchases to the fall of 2012. Tr. 2/25 at 227. A reasonable juror could reconcile Dorsey's testimony on direct and re-cross by concluding that some, though not all, of Dorsey's purchases for Whitehead, Edwards, and Lewis took place within the indictment period. Because

---

[3] Contrary to Whitehead's argument here, Dorsey's testimony on re-cross does not establish that his last purchase of cocaine for Whitehead, Edwards, and Lewis took place in April 2012.

my role here is to "uphold the jury verdict . . . as long as it passes the 'bare rationality' test," I find that this is sufficient to defeat Whitehead's motion.[4]

In sum, based on the evidence produced during trial, a reasonable juror could conclude that Whitehead and Payne engaged in a common drug dealing enterprise with other members of the Rose Upland Gang and with each other. The jury was therefore justified in convicting Payne of the distribution counts against him, and convicting Whitehead and Payne of conspiracy.

### B. The Government's Evidence Against Church

The government's case against Church was similarly strong. Based on Dorsey's testimony and intercepted phone calls involving Church, Dorsey, and other members of the Rose Upland Group, the government was able to show that that co-defendant Donald Womack introduced Dorsey and Church in late November 2013. Tr. 2/29 at 34–37. Dorsey's testimony and recorded phone calls further disclosed that on November 21, Dorsey traveled to Church's residence where Church fronted him 250 grams of cocaine. *Id.* at 40–45. Dorsey was able to sell quickly the initial 250 grams, and the following day he purchased from Church an additional unspecified quantity of cocaine.[5] *Id.* at 47–59; Tr. 2/24 at 209–10. Over the next two-odd weeks, the record shows that Church sold Dorsey cocaine in the following amounts: November 26, 250 grams, Tr. 2/29 at 85–87; December 1, 250 grams, *id.* at 91–95; December 8, 125 grams and, later that night, an additional 28 grams, *id.* at 176–78. Furthermore, on December 6, Church fronted to Dorsey 100 grams of heroin. *Id.* at 135–137. And when Dorsey failed to repay

---

[4] In his Rule 29 motion, Whitehead also introduces what he claims is new evidence: records from the Pennsylvania Department of Corrections showing that Dorsey entered Minsec on February 29, 2012. Because Mr. Pinto already succeeded during trial in establishing that Dorsey entered Minsec in February 2012, *see* Tr. 3/1 at 114, I fail to see how these records shed any new light on the timing of Dorsey's purchases on behalf of Whitehead, Edwards, and Lewis.

[5] While it is unclear precisely how much cocaine Church sold to Dorsey on November 22, Dorsey testified that it was at least four-and-a-half ounces—roughly 125 grams. Tr. 2/29 at 58.

Church for that heroin, Church was overheard complaining to Womack that "I done that shit for the three of us"—meaning Church, Womack, and Dorsey—"everybody supposed to be alright off that." Tr. 2/25 at 12. At trial, the government plausibly construed Church's statement to mean that all three men were supposed to profit from Church's consignment sale of heroin to Dorsey—an explicit admission of common purpose that further supported the government's already strong case for conspiracy.

In light of the extensive evidence presented at trial, there was ample basis for the jury to convict Church of the trafficking, possession, and conspiracy charges. As to the charge of trafficking within a protected location, the record shows that the government introduced expert testimony from a law enforcement agent who measured the distance from Widener University to various drug sale locations. This testimony was cut short, however, when counsel for all defendants facing protected-location counts, including Church, stipulated that their clients' alleged sales had taken place within 1,000 feet of Widener University. Tr. 3/10 at 193–197. Having so stipulated, Church cannot use his Rule 29 motion to challenge his conviction for trafficking within a protected location.[6]

## IV. CONCLUSION

For these reasons, Church's and Whitehead's Rule 29 motions and Payne's Rule 33 motion will be denied. An appropriate order follows.

/s/ Gerald Austin McHugh
United States District Judge

---

[6] Payne's counsel also stipulated that his client's alleged sales took place within 1,000 feet of Widener University. *Id.* at 194. To the extent that Payne now wishes to challenge his conviction of trafficking within a protected space, his motion fails for same reasons as Church's.